IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JOSEPH A. GIDDINGS                                                                PLAINTIFF

        v.                 Civil No. 5:16-cv-05035

SHERIFF KELLEY CRADDUCK;
LIEUTENANT ROBIN HOLT;
LIEUTENANT S. DARNER;
LIEUTENANT J. MARTINEZ;
SERGEANT T. SHARP; DEPUTY T.
KELL; DEPUTY MUNDAY;
DEPUTY MASSEY; and
DEPUTY WIESER                                               DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

This is a civil rights claim filed by the Plaintiff pursuant to 42 U.S.C. § 1983. Plaintiff proceeds *pro se* and *in forma pauperis.*

Plaintiff is currently incarcerated in the Ouachita River Unit of the Arkansas Department of Correction (ADC). The events at issue in this case occurred while he was incarcerated in the Benton County Detention Center (BCDC). Plaintiff's sole claim is that he was denied an adequate diet. Specifically, he contends the food he received was calorically and nutritionally inadequate.

The case is before me on the motion for summary judgment (Doc. 26) filed by the Defendants. A hearing was held on January 5, 2017, to allow the Plaintiff to testify in response to the motion. At the conclusion of the hearing, the motion was taken under advisement pending preparation of this report and recommendation.

AO72A
(Rev. 8/82)

## I. Background

Plaintiff was incarcerated in the BCDC from February 25, 2015, until February 5, 2016. *Defendants' Exhibit* (hereinafter *Defts' Ex.*) A-1 at 13-14.[1] He was in pretrial status until October 26, 2015. *Id.* at 25.

Plaintiff testified he was an insulin dependent diabetic until 2009, when he began controlling his diabetes through diet. *Defts' Ex.* B at 11. Plaintiff testified that while he was at the BCDC, he was still controlling his diabetes through diet.

Plaintiff testified that when he was booked into the BCDC, he weighed 274 pounds. He had been weighed the day before he was transferred to the BCDC. His average weight was 275. *Defts' Ex.* B at 12.

Plaintiff testified that on February 8, 2016, when his weight was recorded at the ADC, it was 200 pounds. Plaintiff contends he lost 74 pounds over the course of his incarceration at the BCDC. Plaintiff testified that, at the time of the hearing, he weighed 250 pounds.

On Plaintiff's BCDC intake form in the area on the form where the inmate's weight is to be entered the number entered was 270. *Defts' Ex.* A-1 at 13. At the top left corner of the page, however, there is a handwritten notation: "weight 254." *Id.* No explanation was offered as to what the handwritten notation meant. On another form, apparently also completed when Plaintiff was booked in, entitled Benton County Jail Personal Information, his weight is listed as 230. *Id.* at 14. Thus, three different weights, varying by as much as 40 pounds, were recorded for the Plaintiff on the same date, February 25, 2015. *Id.* at 13-14.

On release on February 5, 2016, Plaintiff's weight was recorded as 230. *Defts' Ex.* A-1 at 24. The accuracy of this form is questionable. Plaintiff testified the weight entered was

---

[1] Page references on this exhibit are to the jail file number located on the bottom center of the page not to the CM/ECF page number.

"[a]bsolutely wrong." *Defts' Ex.* B at 31. It appears the information may have been copied from information entered previously on the form entitled Benton County Jail Personal Information. *Defts' Ex.* A-1 at 14. Plaintiff's weight was recorded by medical staff as being 205 on January 7, 2016. *Defts' Ex.* A-2 at 16. Plaintiff's intake weight at the ADC on February 8, 2016, just three days later, was 200 pounds. *Defts' Ex.* B at 31; *Defts' Ex.* C at 4.

Plaintiff testified that he had no issues with the diet provided until April or May of 2015, when the facility went from serving only cold meals to serving hot meals.[2] Plaintiff indicated the cold food they received was all edible. *Defts' Ex.* B at 60. Once the hot meals started, he stated that the portion size was not uniform and became smaller and decreased again in size again in August. He testified there were times when the trays had ingredients missing, rotten lettuce on one occasion, undercooked food, overcooked food, or the food was saturated in dressing. On one occasion, Plaintiff complained his biscuit was as thin as a cracker while some inmate's biscuits were three inches thick. When he asked for replacement food or a replacement tray, he would be told that not enough food was made to replace items. To his recollection, there was only one occasion when he received a replacement tray. He believed he received the replacement tray because there was either hair or dirt in the food.

Plaintiff filed multiple grievances regarding the food. *Defts' Ex.* A-3. While he raised many of the deficiencies he testified about, his most frequent complaint was that the beans were uncooked or undercooked. *Id.* He testified he was often told that Catering by Marlins (CBM), the food service contractor, would be notified and/or CBM had been contacted about the issue. No one from CBM addressed the issues raised directly with the Plaintiff. *Id.* Instead, Lieutenant Holt,

---

[2] In his deposition, Plaintiff testified the hot meals began around March 2015 or April 2015. *Defts' Ex.* B at 19-20.

Lieutenant Darner, and Lieutenant Martinez, and occasionally other jail staff members, responded to the grievances. *Id.* Plaintiff testified that nobody would fix the problems. *Defts' Ex.* B at 19.

Plaintiff testified that toward the end of August or the beginning of September, the trays would be bad for three or four days in a row. He testified that on one occasion, following the serving of a taco tray, there was mass sickness with the inmates vomiting and having diarrhea. He indicated that jail staff said it was the stomach flu. There were four to six other times he ate something that made him sick with diarrhea and nausea when he did not see the nurse or doctor. *Defts' Ex.* B at 21-24. In fact, Plaintiff testified he felt sick "a lot because of the food." *Id.* at 27.

Initially, Plaintiff testified he did not complain about the food because it was jail and "[t]hey usually don't do anything when you're in jail." *Defts' Ex.* B at 27. He started putting in grievances when he "was getting too sick and dropping a lot of weight." *Id.* at 28.

Plaintiff testified his weight loss and sickness was due to a lack of food. In particular, Plaintiff testified he felt weak and lethargic. *Defts' Ex.* B at 58. At times, he believed he was receiving only around 1500 calories. *Id.* at 59.

He stated the food was so bad that he often could not eat what was served. In those cases, he started going without food. There were times he could not sleep because he felt hungry. He also worried a lot about not getting enough food. He testified that because he was diabetic, he frequently was sick.

Plaintiff was not seen by medical staff until June of 2015, when he complained of back pain and athlete's foot. *Defts' Ex.* A-2. Plaintiff testified that by that time, he had lost approximately 40 pounds. When he expressed concern about the weight he was losing to the nurse, Plaintiff testified she did not respond. *Defts' Ex.* B at 36-37. He did not submit any written request for medical treatment because of his weight loss, his weakness, or fatigue. *Defts' Ex.* A-3.

AO72A
(Rev. 8/82)

When he asked medical staff for a special diet of "cooked food," he was told they did not "do special diets to get cooked food." *Defts' Ex.* B at 36. Plaintiff testified he also talked to the nurse in person several times about a special diet. *Id.* at 50. Plaintiff testified that initially the nurse thought it was a joke but then told him they did not write special diets for cooked food. *Id.* at 51.

In Plaintiff's medical records, the first time his weight was recorded was on June 30, 2015. *Defts' Ex.* A-2 at 22. His weight was 237. *Id.* On July 27, 2015, when he was seen because of a toothache, his weight was recorded as 233. *Id.* at 3. On August 31, 2015, when he was seen for a "stopped up" ear, his weight was recorded as 232. *Id.* at 5. On November 28, 2015, when Plaintiff was seen for a check-up, his weight was recorded as 212. *Id.* at 11. On January 7, 2016, when Plaintiff was seen because of a complaint about his toe, his weight was recorded as 205. *Id.* at 16. On January 25, 2016, when Plaintiff was seen because of some bruising, his weight was recorded as 200. *Id.* at 18.

Plaintiff testified that he was told since he was not on insulin, he would not be placed on a diabetic diet. He believed Lieutenant Holt had been in charge of that.

Plaintiff testified that because he was indigent he could not order food from the commissary. The only food available to him was that served on the meal trays.

Plaintiff testified that with respect to Sheriff Cradduck, he never saw or spoke to him. In his deposition, Plaintiff stated he did send him a letter around July of 2015. *Defts' Ex.* B at 41. He did not get a response to the letter. *Id.* at 42. Plaintiff also asked a deputy, Gabriel Cox, who lived with the Sheriff, to talk to him about the food. *Id.* Later, when Plaintiff called Deputy Cox over to him, Deputy Cox just shook his head. *Id.* Plaintiff does not believe Sheriff Cradduck was involved in directing what food was to be served or in preparation choices. *Id.* at 43. Plaintiff just believes he should responsible for the decisions they were making. *Id.*

AO72A
(Rev. 8/82)

Plaintiff testified that with respect to his official capacity claim, he did not believe there was a policy to provide inadequate nutrition. *Defts' Ex.* B at 44. In fact, he believed Defendants were violating their own policy. *Id.*

Plaintiff testified that he talked to Lieutenant Holt several times about the food that he was getting and asked for her help in getting the mandated food. *Defts' Ex.* B at 46. Plaintiff testified Lieutenant Holt always responded that she would look into it. *Id.* However, nothing ever happened. *Id.* Plaintiff indicated he was told that he needed to direct anything to do with the kitchen to Lieutenant Holt because she was in charge of it. *Id.* at 47.

Plaintiff testified he spoke with Lieutenant Darner several times about the food but he replied that he could not "do anything about it; that it was up to Lieutenant Holt." *Defts' Ex.* B at 47.

Plaintiff testified he talked to Lieutenant Martinez multiple times. *Defts' Ex.* B at 48. Plaintiff testified he told Lieutenant Martinez all the complaints he had about the food and how he was losing weight. *Id.* at 49. Lieutenant Martinez would say he would look into it. *Id.* Plaintiff testified that was "as far as it would go." *Id.*

Plaintiff testified he never saw Sergeant Darner handling or preparing food. *Defts' Ex.* B at 49. Plaintiff testified that with respect to Sergeant Sharp, he would talk to him about the food and he would "agree that something needed to be done to feed me whatever was owed to me. And then nothing would ever happen." *Id.* at 49-50.

Plaintiff testified that Deputy Kell would deliver the meal trays. *Defts' Ex.* B at 51. Plaintiff indicated he would show Deputy Kell what was on the tray and the problems he had. *Id.* Deputy Kell would respond by saying things like: "Don't come to jail. If you don't like the food, don't eat here." *Id.* Plaintiff testified Deputy Kell would not replace food items that were bad or simply

AO72A
(Rev. 8/82)

missing. *Id.* at 52. As an example of a missing item, Plaintiff said he often would not have a vegetable on the day they would serve peas because he was allergic to them. *Id.* He was not given a substitute vegetable. *Id.* He testified that this would happen once or twice a week.

Deputy Munday also delivered trays. *Defts' Ex.* B at 52. Plaintiff recalled that he was the one who delivered a tray to the Plaintiff containing "rotted, black lettuce." *Id.* at 52-53. Plaintiff testified that when he showed Deputy Munday the lettuce, he replied: "Well, there's nothing I can do about that." *Id.* at 53. Plaintiff testified there were multiple occasions when food items needed to be replaced but that Deputy Munday would not replace anything. *Id.*

Plaintiff also testified that Deputy Massey delivered several trays that had problems. *Defts' Ex.* B at 53. Plaintiff indicated Deputy Massey would not "even acknowledge you when you tell him you've got a problem with your tray." *Id.* at 53-54.

Plaintiff testified that one particular tray Deputy Wieser had delivered was a taco tray that had hamburger in it. *Defts' Ex.* B at 54. Plaintiff stated that there was a big lump of hamburger on his tray and when he cut it open it was "bright red, not cooked." *Id.* Plaintiff showed it to Deputy Wieser who told him not to eat it. *Id.* Plaintiff testified that when he tried to get a replacement tray, he had to talk to Lieutenant Darner who "said he didn't know anything about that; that that never happened." *Id.*

The BCDC contracts with a food service provider, Catering by Marlins d/b/a CBM Managed Services (CBM). *Defts' Ex.* A at ¶ 7. The contract requires CBM to provide a "food services manager who is technically trained in food services and who will manage all food services in the [BCDC]." *Id.* CBM is to: "plan menus; provide portion control; supervise kitchen personnel; train inmates food services staff." *Id.* at ¶ 8. All inmates are to receive the "same quality and quantity of food." *Id.*

The contract requires the creation of appropriate menus that are "equal to or exceed the average daily requirements as stated in the Recommended Dietary Allowances (the minimum daily calorie level offered for sedentary inmates shall be 2300 calories, and the minimum calories of active inmates shall be 2700 calories)." *Defts' Ex.* A at ¶ 9. According to Defendants, if there is a problem with a meal, inmates are to "write a complaint on the kiosk and the complaints are forwarded to the food service provider for review/correction. Detention Personnel are not authorized to make changes or substitutions to trays themselves, but may sometimes be able to return the tray to the kitchen for replacements." *Id.* at ¶ 10.

On September 21, 2015, Plaintiff submitted a grievance about the food. *Defts' Ex.* A-2 at 8. He complained about the meal missing some "normal stuff," the cornbread and biscuits not being prepared properly with some only 1/4 inch thick while other were 3 inches thick, and stating he had been trying to get "properly cooked food" since April. *Id.* Lieutenant Holt forwarded this grievance to CBM. *Id.* Beth, apparently a CBM employee, replied that she believed Plaintiff was getting his nutritional needs and that she did not believe the thickness of the biscuits mattered so long as the kitchen workers were using the cutting guide. *Id.* She did indicate they had run out of baking powder which is what makes the biscuits rise. *Id.* Her reply went to Lieutenant Holt not the Plaintiff. *Id.* This is the only document in the record showing any communication between one of the Defendants and CBM personnel.

Defendants have submitted as Exhibit A-4 what they indicate are weekly serving summaries for the BCDC. The first three pages of the exhibit appear to be dated January 23, 2012, and represent week 1, 2, and 3.[3] *Defts' Ex.* A-4 at 1-3. Each page contains menus with three meals a day for one week. *Id.* Serving sizes are indicated beside each food item. *Id.* Pages four through

---

[3] At the top center of each of the first three pages, the date written is: 23 Jan 2012. *Defts' Ex.* A-4 at 1-3.

six are dated March 10, 2015, and contain printed menus for week 1, 2, and 3. *Id.* at 4-6. The menus do not contain any information about the calories. *Id.*

Defendants have submitted a number of policies dealing with food service, portion control including the use of portion control equipment, and maintaining the necessary caloric and nutritional value. *Defts' Ex.* A-5. None of the submitted policies discuss the handling of food related grievances. *Id.*

## II.  Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." <u>National Bank of Commerce v. Dow Chemical Co.</u>, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." <u>National Bank</u>, 165 F.3d at 607 (<u>citing Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." <u>Id.</u> (<u>citing, Metge v. Baehler</u>, 762 F.2d 621, 625 (8th Cir. 1985)).

AO72A
(Rev. 8/82)

### III.  Discussion

Defendants move for summary judgment on the following grounds:  (1) there was no constitutional injury; (2) Sheriff Cradduck was not personally involved in setting the menu or the preparation and serving of the food; (3) they are entitled to qualified immunity; and (4) there is no basis for official capacity liability.

### (A).  Inadequate Diet

The Eighth Amendment's prohibition against cruel and unusual punishment is violated if an inmate is not provided with meals adequate to maintain his health.  See e.g., Keenan v. Hall, 83 F.3d 1083, 1091 (9th Cir. 1996); Wishon v. Gammon, 978 F.2d 446, 449 (8th Cir. 1992) (prisoners have a right to nutritionally adequate food); Campbell v. Cauthron, 623 F.2d 503, 508 (8th Cir. 1980) (prisoners are guaranteed a reasonably adequate diet).  "The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing."  LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1993).

An Eighth Amendment claim has both an objective and subjective component.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  The objective component "tests whether, viewed objectively, the deprivation of rights was sufficiently serious."  Irving v. Dormire, 519 F.3d 441, 446 (8th Cir. 2008).  The subjective component "requires that the inmate prove that the prison officials had a 'sufficiently culpable state of mind.'"  *Id.* (quoting Farmer, 511 U.S. at 834).

In claims involving allegations of an inadequate diet, the subjective component requires the Plaintiff to show that the Defendants were deliberately indifferent to his dietary needs.  Wishon, 978 F.2d at 449; see also Butler v. Fletcher, 465 F.3d 340, 345 (8th Cir. 2006) (deliberate indifference standard applies to claims brought by pretrial detainees that prison officials failed to provide adequate food, clothing, shelter, etc.).  "Because control of the

administrative details of a prison remains exclusively in the hands of prison officials, control of the diet is within their discretion, assuming it is adequate." Burgin v. Nix, 899 F.2d 733, 734 (8th Cir. 1990).

Defendants first argue that they cannot be held constitutionally liable because there is no evidence that any of them were responsible for the preparation of any meal served to the Plaintiff. They point out that Benton County has contracted with CBM to create appropriate menus and coordinate the preparation of all food served to inmates. Defendants argue that "[l]ike medical decisions made by medical professionals, the dietary decisions made by the food provider are not subject to review or change by any of the Defendants." Doc. 27 at 4. In short, Defendants argue the contract with CBM essentially insulates them from liability.

I disagree. "Contracting out prison [food service] does not relieve the State of its constitutional duty to provide [an adequate diet] to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." West v. Adkins, 487 U.S. 42, 56 (1988). The summary judgment record establishes that all grievances regarding food or food service being inadequate in some way were addressed by jail staff not by CBM staff. Other than the one instance when Lieutenant Holt contacted a CBM employee, it is not clear that any other grievances were passed onto kitchen staff. Thus, Defendants were the sole means by which Plaintiff could vindicate his Eighth Amendment right to an adequate diet.

Having reached this conclusion, does not, however, establish that there is a genuine issue of material fact as to whether the diet served the Plaintiff was constitutionally inadequate. As discussed in more detail above, Plaintiff complained of undercooked food, overcooked food, inedible food, rotten lettuce on one occasion, and missing or very small portions of food. The records, viewed in the light most favorable to Plaintiff, show that Plaintiff's weight went from

270 on February 25, 2015, to 200 on February 8, 2016. A loss of 70 pounds over the course of just a few days short of a year is significant. Clearly, the constitution would not permit the "incremental starvation" of inmates, George v. King, 837 F.2d 705, 707 (5th Cir. 1988); however, the loss of weight must be considered in context. As Defendants quite accurately point out, Plaintiff was obese when he entered the BCDC and still overweight when he was released from there.[4] See e.g., Whitney v. Morse, 2016 WL 908268 (W.D. Ark. Feb. 4, 2016)(loss of 23 pounds from March to October where Plaintiff still weighed more than recommended weight for his height insufficient where there is no evidence plaintiff became ill or suffered any other adverse physical effects or was denied a nutritionally and calorically adequate diet); Ahlers v. Kaskiw, 2014 WL 4184752, *9 (N.D.N.Y. Aug. 21, 2014)(loss of 66 pounds over more than four years--"plaintiff's gradual transformation from obesity to a healthy body weight clearly does not satisfy the objective prong of the deliberate indifference standard"); Evans v. Albany Cty. Corr. Facility, 2009 WL 1401645, *10 (N.D.N.Y. May 14, 2009)(even assuming that plaintiff lost 30 pounds and experienced dizziness and headaches over a four-month period, the court concludes there is no evidence from which a reasonable trier of fact could find an Eighth Amendment violation).

Moreover, Plaintiff lost weight at a rate of approximately 1 ½ pounds per week. According to the National Institute of Health (NIH), losing one to two "pounds per week is a reasonable and safe weight loss.[5]" In attaining a healthy weight, the NIH indicates that "eating

---

[4] A 5'11" male born on Plaintiff's date of birth is considered obese at a weight of 270. At a weight of 200 pounds, the same individual is considered overweight.
http://www.mayoclinic.org/diseases-conditions/obesity/in-depth/bmi-calculator/itt-20084938 (Accessed June 1, 2017).
    The Court takes judicial notice of the Mayo Clinic website pursuant to Fed. R. Evid. 201(b)(2). See Lumb v. McDonald, No. 15-0577, 2016 WL 4411115, at *2 (Ct. Vet. App. Aug. 19, 2016).

[5] https://www.nhlbi.nih.gov/health-pro/resources/heart/aim-facts-html (accessed June 6, 2017). The Court takes judicial notice of the National Institute of Health's website as well.

AO72A
(Rev. 8/82)

plans containing 1200 [to] 1600 calories each day are suitable for men.[6]" Assuming there were days when Plaintiff received only 1500 calories, this is insufficient to create a genuine issue of material fact as to whether the diet he received was so inadequate that it violated the Eighth Amendment.

Plaintiff did not report any problems with his diabetes as a result of the diet he received. He did not seek medical treatment as a result of the weakness and fatigue he testified he experienced or the sleeplessness he indicated he suffered as a result of feeling hungry. There is no evidence, other than his loss of weight, that the diet was nutritionally inadequate. Wishon, 978 F.2d at 449. There is no genuine issue of material fact as to whether the alleged deprivation denied the Plaintiff "the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Defendants are entitled to summary judgment.

**(B). Qualified Immunity**

Having found that the facts do not make out a constitutional violation, Defendants are entitled to qualified immunity. See, e.g., Krout v. Goemmer, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

**(C). Official Capacity Claims**

"Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself." Gorman v. Bartch, 152 F.3d 907, 914 (8th Cir. 1998)(citation omitted). In this case, Plaintiff has

---

[6] *Id.*

not alleged the existence of any policy or custom that was the moving force behind the alleged violations of his constitutional rights. In fact, Plaintiff testified that he believed the Defendants were violating their own policy by providing him with bad food. Further, as no constitutional violation exists, the official capacity claims are subject to dismissal. Olinger v. Larson, 134 F.3d 1362, 1367 (8th Cir. 1998)(As no constitutional violations have been found, the governmental entity cannot be held liable).

### IV. Conclusion

For the reasons stated, I recommend that Defendants' motion for summary judgment (Doc. 26) be **GRANTED** and this case **DISMISSED WITH PREJUDICE.**

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 6th day of June 2017.

/s/ *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)